HIXON *v.* GEORGIA SOUTHERN AND FLORIDA RAILWAY COMPANY; *et vice versa.*

ATKINSON, J. 1. The petition as amended alleged a cause of action, and the judge did not err in overruling the demurrer.

2. Walter Hixon, son of plaintiff, a non-expert witness, testified that plaintiff, at the time of signing the contract releasing the defendant from liability, in his opinion was not normal or in a condition to transact business, giving as his reasons for such opinion that "her husband had just got killed, and she had just been over there and seen him, and so soon after the accident he [defendant's claim agent] came out there." Another witness testifying as a non-expert gave evidence of similar import, giving as her reasons for the opinion: "When I reached there, Mrs. Hixon came out on the porch, and I said to her that I did not know anything I could do, except to come over and offer my sympathy, but first I wanted to tell her not to go to the station and see his remains, and she screamed out and said, 'I have already seen them, there is a little pile there and a little pile here, and they would not let me pick up his hand, and when I left there they were picking him up with a shovel." *Held*, that the court erred in ruling out this testimony.

3. The court did not err in rejecting testimony as to the apparently satisfied manner of the defendant's claim agent after he had obtained the settlement.

4. The court having ruled out the testimony of a witness as to her opinion of the mental condition of plaintiff at the time she signed the contract of release, there was no error in subsequently ruling out the answer of the same witness, on cross-examination, to the question: "Why did you witness this release, if you thought that Mrs. Hixon was not in any condition to transact business?"

5. The petition having alleged that as a part of the "release contract" the defendant had paid the funeral expenses, and that the amount thereof had. been tendered back to the defendant before instituting

suit, there was no error in rejecting testimony to the effect that the bill of the undertaker was not paid by the defendant until after the filing of the suit.

6. Under all of the evidence it was a question for the jury to decide whether or not the railroad company was negligent, and whether or not the plaintiff's husband was negligent so as to reduce the amount of damages, or whether his conduct showed such want of ordinary care for his own safety as would defeat a recovery for any amount.

7. The evidence as to the circumstances and scene of the mangled remains of the plaintiff's husband as viewed by her but a short while before signing the contract was most unusual, and it was for the jury to decide whether at the time of signing the release the plaintiff was in a condition to understand the contract and to comprehend its effect, or whether, in view of the calamity which had happened to her and its shocking details, she was deprived of the use of her mental faculties to such an extent as to prevent her from understanding the contract into which she entered.

8. It was also a question for the jury whether or not, in view of the circumstances to which reference has been made, and the wife's inability to bear the expense of the funeral, the statement of the defendant's representative that she had no case against the railroad company did not amount to duress constraining the plaintiff to sign the contract as a part of the consideration of which her husband would receive burial.

9. It was erroneous to grant a nonsuit.

*Judgment reversed on the main bill of exceptions, and affirmed on the cross-bill. All the Justices concur.*

Nos. 5325, 5337.   FEBRUARY 17, 1927.

REHEARING DENIED FEBRUARY 26, 1927.

Action for damages, etc.   Before Judge Malcolm D. Jones. Houston superior court.   February 16, 1926.

Kathleen, Georgia, is an unincorporated railroad station in Houston County at which there is a station building.   The railroad at that point runs north and south.   There is a main-line track, on each side of which is a side-track.   There is a space of approximately six feet between the western rail of the main-line track and the eastern rail of the west-side track.   A public road crosses the railroad tracks at a point immediately south of the station building.   About one o'clock in the day a south-bound freight-train took the west-side track and blocked the crossing, the tender of the locomotive standing on the crossing.   S. S. Hixon, a traveler on the public road in his wagon, approached the east side of the crossing and waited approximately 25 minutes for the railroad employees to unblock the crossing.   Finally he signaled the engineer, requesting him to unblock the crossing.   The engineer shook

his head.  Thereupon Hixon got off the wagon and walked across the railroad tracks to the side of the engine, about 24 feet south of the south edge of the public-road crossing, and stood in the said space between the west rail of the main-line track and the east rail of the west-side track with his back to the north, and asked the engineer to clear the crossing.  The engineer assented, and started the engine in motion which was puffing and blowing and making a great deal of noise.  As the engine started Hixon stepped slightly aside towards the main-line track.  As he did so a southbound passenger train approached suddenly without warning or giving signal, and struck him in the back, knocking him down and running over him and cutting his body to pieces.  The train ran approximately four car-lengths after striking Hixon before it stopped, which was two car-lengths beyond the usual stopping place.  The track was straight, and Hixon was in plain view and could have been seen by the engineer for a quarter of a mile.  The train ran over the crossing at a rate of twelve miles an hour.  The engineer did not, in compliance with section 2 of the act of 1918 (Acts 1918, p. 212), upon reaching the blow-post 400 yards from the crossing, blow the whistle two long and two short loud and distinct blasts at intervals of five seconds between each blast; nor did the engineer, after reaching the blow-post farthest from the crossing and while approaching the crossing, keep a vigilant lookout along the track ahead of the engine in order to avoid injury to any person who might be on said crossing or upon the line of railway within fifty feet of such crossing.

Shortly after the catastrophe the widow of Hixon was notified, and she went to the scene, arriving at about 3 or 4 o'clock in the afternoon.  She saw the mutilated remains scattered along the track, the hands at one place, the head at another, and the liver at another.  In great distress she was endeavoring to collect the remains when she was persuaded by a friend to stop and return home.  She was without business experience, ignorant of her legal rights, and greatly agitated and distressed.  Her "one thought" was to have the remains of said husband buried at his old home in another county.  In these circumstances a local undertaker who had been employed by the attorney of the railroad company went to her for directions as to disposition of the remains, and she expressed to him her desire as above indicated.  Within a few min-

utes after the undertaker left, about 5 o'clock in the afternoon, the claim agent of the railroad came to her home and stated to her that he had seen the undertaker, and if she did not sign a release to the railroad company she would have to bury her husband at her own expense; that he was in a hurry to get back and notify the undertaker; that it was too great expense to bury her husband at his old home; that the railroad company would do nothing towards burying her husband, but would "hands off" unless she would sign a release. He also stated that the railroad company was not liable to her for the homicide, and that she had no case whatever against the company. At the time these statements were made to her, suffering as she was from the grief and sorrow of her husband's death and the recent vision of his mangled remains, she did not have mental capacity to make a contract or understand the legal effect of a contract of release; but, relying on said representations and being herself unable financially to provide for the burial of her said husband, she signed the release. In fact the said statements made to her by the claim agent to induce her signature were all false, and, being made under the circumstances, amounted to duress and legal fraud. The consideration stated in the release was fifty dollars and the expense incurred by the company in burying her husband, amounting to $135. Immediately after realizing the fraud and being advised as to her legal rights, she elected to rescind the contract, and tendered back the fifty dollars and the amount of burial expenses. In an action instituted by her against the railroad company, for damages and for cancellation of the contract of release, the petition as amended alleged substantially all that is stated above.

The defendant filed demurrer on the following grounds: Generally, because: (a) The petition fails to allege a cause of action or right to recover. (b) The petition shows a complete accord and satisfaction by a valid contract upon a valuable consideration, and does not allege ground for setting aside the contract. Specially: (a) To subparagraph (a) of paragraph 16. The plaintiff struck this subparagraph by amendment. (b) To the language: "Petitioner shows that the procuring of her signature to the release as aforesaid amounted to duress and legal fraud, and that said release is therefore null and void and of no legal binding effect upon petitioner," occurring in paragraph twenty-four of the petition, be-

47

cause such allegations are mere conclusions of the pleader. The demurrer was overruled. The defendant also filed an answer and a special plea, the latter setting up the contract of release. On the trial the plaintiff introduced evidence tending to show the location of the railroad tracks, the public road, the blocking of the crossing, the time of the blocking, the fact of the homicide, the mutilation of the body, the signing of the release, payment of the money, repudiation of the contract and tender back of the money, substantially as alleged in the petition.

Moody testified, in part: "Mr. Hixon got off the wagon and walked over there and asked the engineer how long it would be before he could cross. . . I walked over to where he was standing right there at the steps where you step on the freight-engine, and asked him to give me a match. When I got the match from him I was standing back over here on this track here, which was the main-line track. The only conversation I heard between Mr. Hixon and the engineer on the freight-train was when he asked him how long it would be before he could cross. The engineer said it would not be long. I could not exactly tell how long a time passed after the engineer told Mr. Hixon that it would not be long, before the freight-train commenced to move. After I got the match I stood there a pretty good while looking at the engine. While I was standing there looking at the engine Mr. Hixon was standing there talking to the engineer. I could not hear what they were talking about. With my match I lit my cigarette. A minute is sixty seconds long. I stood there about three minutes after I got the match and commenced smoking my cigarette, before the freight-train commenced to move. I did not hear any passenger-train coming down there at that time on that main line. I did not hear any bell or whistle blown by any passenger-train. When we were standing there after I lit my cigarette and had stood there about three minutes, this freight-train started shooting off steam and moving off, and I just looked up the railroad; and when I looked around, the passenger-train was about as close on me as from here to that book-case there, about ten feet away. When I saw the passenger-train that close to me I reached over to pull Mr. Hixon back on this side, and I could not quite reach him, and I jumped back on this side of the track. I reached over here to pull Mr. Hixon back over here. I could not touch him. Then I

jumped back over here. I was standing here, I jumped over here. Mr. Hixon was standing right here. The passenger-train did not hit me; it missed me about a foot. The passenger-train was coming from towards Macon, going south."

Walton Hixon, son of deceased, testified, in part: "I first learned that he was killed about one o'clock. I went on over to the station. My mother went . . with me. When we got there we . . looked at him, and mother like to broke down, and Dr. Story came out, and we took mother on away. . . Mother was just all to pieces, pretty near it, nervous as she could be, . . taking on and . . crying, and wanted to . . pick him up. She did not do that. Dr. Story stopped her. It was something like an hour and a half before we got back home. . . Mr. Carter, the railroad claim agent, came out to see my mother . . that afternoon. . . Mr. Carter went . . in the room where Mamma was, and commenced talking to her. . . He . . told her that he was the claim agent and came to see about it. He said he was mighty sorry it happened, and that he came out there to see about burying him. He asked her where she wanted him to be buried, and she told him over home in Ellaville; and he said that was too great an expense, and he said that he had a release there, and she would have to sign it if he buried my father over there. He said, if she did not sign that release he would just drop it, that it was not the fault of the railroad, and that she had no case against the railroad, and for her to hurry up so he could notify Sims, the undertaker. He said he had already seen him. Mamma called Miss Margaret Small and asked her about it, and Miss Margaret told her she could not advise her anything. That was not in the presence of Carter. Mamma said she did not know what to do, and went out there and talked to Miss Margaret. Miss Margaret asked me to go out there, and Mamma asked me about what to do. I told her I did not know what to do. She could use her own judgment. She was in pretty bad condition, in my opinion, nervous as she could be, tore all to pieces. I am twenty-nine years old. Something like an hour elapsed since Mother saw the remains of her husband, and this conversation with Mr. Carter. Mr. Carter wrote out the release. He wrote out the release and Mamma signed it, and he asked Miss Margaret Small to witness it, and then he asked me to witness it, and then he wrote out a check for

$50 and gave it to her and told her to indorse it and he would go over and get it cashed for her. She told him she did not know whether she could write her name or not where they could read it, she was so nervous."

Miss Margaret Small testified, in part: "I lived about two miles from Mrs. Addie Hixon, the plaintiff. . . At that time she was living on my brother's place. . . When I learned of Mr. Hixon's death I . . started over to see her. . . I don't know exactly what time I reached Mrs. Hixon's home. I had been there about half an hour . . before Mr. Carter came. It was about four or five o'clock. . . He came in while we were discussing this, and Dr. Story and Mr. Sims came out later after I discussed this with Mrs. Hixon, and Mr. Sims talked with Mrs. Hixon and got her wishes in the matter and then came back. Mr. Sims, the undertaker, had come and gone; and Mrs. Hixon was very calm and quiet then, because he had given her the impression that he was going to do what she wished done. I was there when Mr. Carter came. Mr. Martin and Mr. Cole came with him. Mr. Cole brought them out. Mr. Cole is the section foreman. I met these gentlemen at the door. Mr. Carter told me who he was, and introduced Mr. Martin, and I told him to come in, and he came on in the room where Mrs. Hixon was, and I told her this was Mr. Carter, the claim agent, and he had come to see her about the funeral. He told her he understood she wanted the remains carried to Ellaville, and that that would be very expensive, and it was not incumbent on the road to go to that expense, that they were not at fault; and I left the room. I left the room and did not go back until Mrs. Hixon called me out on the porch. Mrs. Hixon called me and asked my advice, that Mr. Carter said he would not bury her husband unless she signed the release, and asked me what to do about it, and I told her I could not advise her. I went in the room where Mr. Carter was and told him Mrs. Hixon had asked my advice, and that I thought she had a very good case against the railroad, and he said 'No, she has not; a great many people like you might think that, but it is not incumbent on the railroad to go to any expense to bury him,' and that they would not do it unless she signed the release, and I said, 'Surely, you will give her something besides the funeral expenses,' and he said, 'Yes, I will give her $50,' and I told Mrs. Hixon what he said. Mrs. Hixon

seemed to me as being all to pieces, very nervous over it, and would break out and cry and say she never would forget the sight to her dying day, and said she would always see him on the track. I have been knowing Mrs. Hixon only since she has been living on my brother's place, 1923. I have known her about two years. When she was telling this she was as nervous as she could be. I says, 'I am so sorry you saw all that,' and she said, 'No, I saw it,' and she said, 'I even saw his liver.' I said, 'Mrs. Hixon, try to forget it and try not to think about it.' I asked her if any one had been to see her, and she said, 'Nobody except you,' and told how nice Dr. Story had been to her. . . Mrs. Hixon has got what you call a fair education. I suppose she had gone through the grammar grades probably. She didn't have anybody there at that time consulting with or advising her, other than myself and Mr. W. C. Hixon. All that came to the house while I was there were men connected with the railroad. I wasn't in a position to advise her, either as to her rights or what she should or ought to do. There was no one I could talk with, except the railroad men, and they all said she had no claim whatever. In the way of finance she had nothing whatever. I know Dr. Story, the physician for the railroad at Kathleen."

Mrs. Hixon, the plaintiff, testified, in part: "I did not learn he had been killed until Sam Roughton came and told me about it, and I then went to Kathleen with Sam Roughton and saw my husband's body on the track before it was picked up. I also saw them when they were picking his body up with spades. Mr. Sims and Dr. Story were the first ones to come out to my house, but I don't know how long it was afterwards. I told Mr. Sims I wanted my husband buried nicely, that it was his request he be buried at home, which was Ellaville, and I wanted it done. At that time I had no money and was not financially able to do that. It was not very long after Mr. Sims left me before Mr. Carter came, and he said he was the claim agent of the railroad, and he understood from Mr. Sims I wanted Mr. Hixon's body carried home, and I told him I did, and he said the expense was so great he couldn't do it unless I would sign a release, that I had no claim whatever, that Daddy fell between the car and engine, and I says, 'It must have been his heel; he came near falling this morning, but it was before he put on his shoe;' and Mr. Carter said he fell between the milk car and

engine, as well as I remember, and I says, 'Well, I don't know,' and he said I had no claim whatever, and if I didn't sign it he couldn't bury him, that he couldn't go to that expense, that it was just the goodness of him to bury him, and I told him I couldn't do nothing else, that I couldn't take him home; and he left the impression on me it would take $125 to carry him to Ellaville. Ellaville was my husband's old home where he was raised. I have had just a common school education in the country. I believed what Mr. Carter said. I was not thinking of anything but getting my husband home, and he said I had no case against them, and I says, 'Well, I just as well do as you say,' and I knew I couldn't carry him there any other way, and Mr. Carter said if I didn't sign the release he would hands off and wouldn't do it. . . When I got to Kathleen I saw Mr. Bryan and Dr. Story and Mr. Green, and I judge the foreman of the railroad there, Mr. Cole. I stayed there until I could not stay any longer; they wouldn't let me take him up, and they wouldn't do it; and I told them I couldn't stand it, that I wanted to go home. After I got home Dr. Story and Mr. Sims came to see me, and it was not very long after Mr. Sims left before Mr. Carter came."

At the conclusion of the evidence a nonsuit was granted. The plaintiff excepted. The defendant filed a cross-bill of exceptions assigning error on the overruling of the demurrer.

*R. D. Feagin,* for plaintiff.

*J. E. Hall, C. J. Bloch,* and *Duncan & Nunn,* for defendant.